ESTATE OF CLARA S. ROEDER WINKLER, DECEASED, DORIS ANN WINKLER, TRUSTEE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Winkler v. Commissioner
Docket No. 28151-85.
United States Tax Court
T.C. Memo 1989-231; 1989 Tax Ct. Memo LEXIS 231; 57 T.C.M. (CCH) 373; T.C.M. (RIA) 89231; May 11, 1989. Theodore J. Esping and Brian K. Burke, for the petitioner. Russell D. Pinkerton, for the respondent. PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: Respondent determined a deficiency of $ 142,328.60 in the Federal estate tax of the Estate of Clara S. Roeder Winkler, *232 who died in 1981. After concessions, [1] the sole issue for decision is the fair market value on the date of Mrs. Winkler's death of 8,000 shares of Class A voting, common stock and 7,600 shares of Class B non-voting, common stock in Rock Island Refining Corporation. *233 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. The petitioner is the Estate of Clara S. Roeder Winkler, deceased, Doris Ann Winkler, Trustee. Doris Ann Winkler, a resident of Los Olivos, California, is the trustee of the Clara S. Roeder Winkler Living Trust. [2] This trust held all of the assets of the decedent on the date of her death, September 28, 1981. The decedent, Clara S. Roeder Winkler, created this trust on July 31, 1978. The trust directed that upon the death of the grantor, the trustee was to distribute all shares of the Class A voting, common stock of Rock Island Refining Corporation equally to her two daughters and son. In addition, the trust stated that all other trust property was to *234 be distributed in accordance with its value at the date of distribution to certain specified individuals and trusts. Clara S. Roeder Winkler died testate on September 28, 1981, a resident of the city of Los Olivos, California. The decedent's last will and testament was not probated but was filed for safekeeping in the Superior Court, Santa Barbara, California. A Federal estate tax return, Form 706, was timely filed on behalf of the decedent's estate on June 29, 1982. The decedent's Federal estate tax return included the Clara S. Roeder Winkler Living Trust in the decedent's estate, as a transfer during the decedent's lifetime. The return stated that the value of the trust was $ 1,391,944.59. The return listed items in the trust, which included 8,000 shares of Class A voting, common stock and 7,600 shares of Class B non-voting, common stock in Rock Island Refining Corporation. On this estate tax return, the Class A stock was valued at $ 160,000 or $ 20 per share and the Class B stock was valued at $ 152,000 or $ 20 per share. Rock Island Refining Corporation (hereinafter referred to as Rock Island) is an Indiana corporation that began operation in 1941. Its principal place *235 of business, offices and refinery are located in Indianapolis, Indiana. In its taxable year ending November 30, 1981, Rock Island had a gross profit of $ 57,852,219. From 1941 through the date of the trial, the common stock of the corporation was closely held. The Class A voting, common stock in Rock Island was owned by members of two families, the Winklers and the Simmons, with each family owning 50 percent of the voting stock. In September of 1981, Rock Island was engaged principally in the refining and retail distribution of gasoline and other petroleum products. Rock Island is a small refinery that primarily produces gasoline and has a capacity of 42,500 barrels per day, although the company operates at approximately 31,000 barrels per day. Oil refining is the creation of a wide range of final products from crude oil. The company has no crude oil resources of its own. The refinery is set up for the processing of low sulphur content "sweet" crude rather than the heavy "sour" crude that dominates the supply. At the time the decedent died, substantially all of the crude oil refined by Rock Island was purchased on the open market or from major oil producers under contractual *236 arrangements. The major producer that Rock Island purchases from is Marathon Oil Co., a company that gathers crude from sources throughout the western United States through a pipeline. As of the time of decedent's death, it was expected that Rock Island would continue to depend on others for its crude oil supply. Rock Island wholly owns or has a controlling interest in the outstanding stock of subsidiary corporations engaged in the retail sale of its petroleum products. In 1981 almost 80 percent of the company's gasoline production was distributed through its subsidiary corporations, primarily in Indiana and Michigan. Rock Island owns 100 percent of the stock of subsidiary corporations operating under the names Tulsa, United, and Colonial. Rock Island owns a 90 percent interest in the corporate stock of Imperial. Rock Island's remaining gasoline was sold on the wholesale market to independent retailers. In 1981 Rock Island also operated either directly or indirectly an average of 213 retail gasoline stations, which represented a decline from approximately 240 in 1977. The gasoline stations were primarily self-service stations. The number of stations that Rock Island operated *237 varied somewhat, because the company had a policy of closing low volume stations and concentrating on high volume locations. Rock Island owns the land on which over 70 percent of its retail gasoline stations are located, with the company leasing the land at the other locations. Due to the fact that the price of gasoline was steadily rising, Rock Island's operating revenues grew from $ 284 million in the fiscal year ending November 30, 1977 to $ 527 million in fiscal 1980. However, the cost of crude oil to Rock Island was rising even faster from 1979 through 1981. The company's gross margin of profit reflected this increased cost of crude and dropped from 92 cents per barrel in 1977 to 24 cents per barrel in 1981. Due to the large drop in its gross profit margin, Rock Island reported an operating loss in 1981, its first such loss since 1972. However, the net income derived from the company's subsidiaries was sufficient to allow the company to finish the year with a positive level of earnings before taxes and net income. At the end of 1981 the outlook for the refining industry was dismal. In 1980 the demand for gasoline had begun to decline and this trend continued into 1981. *238 It was anticipated that the number of refineries in operation would continue to decline. Profit margins and capacity utilization rates were expected to remain low due to sluggish demand, increased capacity and foreign competition. In addition, the industry was forced to deal with the elimination of United States government controls, declining demand for refined products throughout the world, increased competition from foreign countries, and the necessity of altering refinery configurations to accommodate changing crude oil supplies and final product demand. Small refineries were especially at a disadvantage since a government subsidy to small refineries for domestic crude oil cost equalization (called entitlements) was abolished in January of 1981. In its 1980 taxable year Rock Island had received $ 33,481,000 in such entitlements and in 1981 $ 1,360,000 in such entitlements. Some hope did exist, however, that if the economy picked up during the later part of 1982, then demand for petroleum products would increase. To remain competitive, refiners were forced to incur large capital expenditures to modernize their plants. In its attempt to enlarge and upgrade the company's refinery *239 facilities, Rock Island made major improvements to its property and equipment in 1980 and 1981. These improvements included a new blower and a bottoms conversion plant to process residual fuel, each of which cost approximately $ 10,000,000. These improvements were made to make the refinery more profitable by improving and making more efficient, rather than increasing, existing capacity. Over a three-year period, Rock Island spent over $ 40,000,000 making improvements to the company's facilities, not all of which were completed by the time of the decedent's death. Thus, in 1981 the company's refinery facilities were modern and well maintained. The management of Rock Island believed that the improvements to the plant made the processes done at the plant cost effective, i.e., that there was no excessive processing beyond what was economically feasible, even though the plant operated at below full production. During the period from November 30, 1976 to August 31, 1981, Rock Island's long-term debt was reduced from $ 6.6 million to $ 3.1 million, while retained earnings increased from $ 42.5 million to $ 74.2 million. On August 31, 1981, Rock Island was strongly capitalized, with *240 long-term debt of only $ 3.1 million and common equity of $ 78.3 million. On September 28, 1981, Rock Island's capital structure consisted of 80,000 shares of Class A voting, common stock and 720,000 shares of Class B non-voting, common stock. With the exception of voting rights, the two classes of stock are treated equally in all other respects, including earnings, dividends, and liquidation. At the time of the decedent's death, the voting stock was still owned equally by the two families, the Winklers and the Simmons. The common stock generally was closely held by the members of seven families. The shareholders of the Class A voting, common stock consisted of three individuals, a trust, and a corporation. The trust was the Clara S. Roeder Winkler Living Trust. The record does not identify the three individuals nor the identity or shareholders of the corporation. The record also does not disclose the distribution of such shareholdings among the Winklers and the Simmons, other than the fact that each family held 50 percent of the voting stock. For some 40 years, neither the Winkler family nor the Simmons family has ever sought control of Rock Island from the other family. *241 The decedent's stock in Rock Island constituted 10 percent of the total Class A voting, common stock outstanding and 1.055 percent of the total Class B non-voting, common stock outstanding. The decedent did not directly or together with her relatives or any others who would normally be expected to act in concert with her, own sufficient Rock Island stock to exercise control over Rock Island. [3]
Rock Island common stock has never been listed on any stock exchange and has never been traded in any over-the-counter securities market. No known public market exists for the shares of either class of stock. No sales of Rock Island common stock took place at or near the date of the decedent's *242 death or for several years prior thereto. None of the shares that were owned by the decedent on the date of her death were subject to any buy-sell or similar agreement. In 1980 Rock Island's earnings per share were $ 10.04. In 1981 Rock Island's earnings per share were $ 4.75. In 1980 cash dividends of $ 1.5625 per share (15.6 percent of earnings) were declared, and in 1981 cash dividends of $ 1.28125 per share (26.9 percent of earnings) were declared. On May 15, 1985, a timely statutory notice of deficiency was mailed to the Estate of Clara S. (Roeder) Winkler, Doris Ann Winkler, Trustee. In the notice of deficiency respondent determined a deficiency in the amount of $ 142,328.60 based on respondent's determination that the value of the decedent's 8,000 shares of Class A voting, common stock of Rock Island was $ 45.94 a share rather than $ 20 a share as reported by petitioner and that the value of the decedent's 7,600 shares of Class B non- voting, common stock of Rock Island was $ 41.77 a share rather than $ 20 a share as reported by petitioner. Respondent based his determination that the Class A stock was valued at $ 45.94 a share and the Class B stock was valued at $ *243 41.77 a share on an appraisal report prepared by Mr. Yale Kramer. [4] Mr. Kramer is the president of Reiss Corporation, which is involved exclusively in the valuation of closely-held businesses. Mr. Kramer, on behalf of respondent, prepared an appraisal report dated January 11, 1985, expressing his expert opinion as to the value of the decedent's stock in Rock Island at the date of her death. Prior to Mr. Kramer's appraisal, Mr. Julian Kiser and Mr. Don Goelzer, of Goelzer & Co., Inc., had prepared for the estate an appraisal report dated January 10, 1983. That appraisal report was prepared after the estate tax return had been filed. Goelzer & Co., Inc. is an investment securities firm that is a registered broker/dealer and a registered investment advisor. Mr. Kiser determined the value of the whole company as *244 if it were traded on a public market. Mr. Goelzer then determined the discounts to apply for the lack of marketability and minority interest of the stock and applied these discounts to the value Mr. Kiser had already calculated. Petitioner's experts concluded that the fair market value of the decedent's stock in Rock Island on September 28, 1981 was $ 22.43 per share for both Class A voting, and Class B non-voting, common stock. In their appraisal reports, both petitioner's experts and respondent's expert initially valued a 100 percent interest in Rock Island as if its stock were sold freely in the public market place as of September 28, 1981. Both petitioner's experts and respondent's expert used the same three publicly held corporations as comparables to Rock Island. [5] Experts for both parties applied price-to-earnings ratios in their analysis of the comparable companies (the market method). The three major differences in the appraisal reports of petitioner's experts and respondent's expert were: 1) that only respondent's expert also used the book value and adjusted book value approach (cost method), and at least considered the earnings method (projected earnings discounted *245 to the present), 2) that only respondent's expert determined that voting stock was worth more than non- voting stock, and 3) the discount each party's expert applied for the lack of marketability and the minority interest of the stock, 45 percent by petitioner's experts and 25 percent by respondent's expert. When comparing the three publicly held corporations to Rock Island, petitioner's experts focused exclusively on each company's price-to-earnings ratio rather than each company's book value or dividend yield. They rejected a book value analysis, arguing that that analysis is more appropriate in cases of potential liquidation or merger or for the valuation of investment holdings, real estate or natural resources companies. Petitioner's experts argued that the value of plant and machinery used to refine gasoline and other products would have little relevance *246 for the willing buyer and willing seller of a minority interest. Petitioner's experts contended that it was incorrect to consider the substantial additions to the facilities of Rock Island in the valuation of the company since it was uncertain how much these improvements would add to the productivity of the company. At trial, however, Mr. Kiser admitted that he did determine the ratio between the value of the stock of the comparable companies and the book value of these companies, which was 103 percent. The appraisers for petitioner also rejected the dividend yield approach, arguing that that analysis is most appropriate when valuing securities of a company with relatively stable earnings and minimal growth prospects. When analyzing the companies comparable to Rock Island, petitioner's expert, Mr. Kiser, compared the average price of the stock to the earnings per share of the three companies for the latest 12 months preceding the decedent's death and for the period closest to five years prior to the date of death (about 4-3/4 years) from 1977 to 1981. Mr. Kiser found that the comparable companies' average price-to-earnings ratio was 8.4 for the latest 12 months and 8.3 for the *247 4-3/4 years. Mr. Kiser applied these figures to Rock Island's latest 12 months (ending August 31, 1981) and for the 1977 to 1981 earnings per share. This resulted in: Latest 12 months
:
$ 3.76 x 8.4 = $ 31.58
1977 - 1981
:
$ 9.65 x 8.3 = $ 80.10
(4-3/4 years)
Mr. Kiser then applied a weighting system in which the latest 12 months were given a 60 percent weighting and the 4- 3/4 years were given a 40 percent weighting. This adjustment resulted in: $ 31.58 x 0.6 =
$ 18.95
$ 80.10 x 0.4 =
32.04
$ 50.99
Mr. Kiser thus determined that the value of the Rock Island stock was $ 50.99 per share or a total value of $ 40,792,000 ($ 50.99 x 800,000 shares) as of September 28, 1981. Mr. Kiser then determined that the $ 50.99 per share should be discounted, because even if Rock Island was in a publicly traded market, Rock Island would not have been given as high a value on a public market as the comparable companies. Mr. Kiser argued that Rock Island's stock would demand a lower value because, unlike the comparable companies, Rock Island had a negative growth trend during the years examined, from 1977 to 1981. In addition, Rock Island's *248 net profit margin was 0.5 percent for the latest 12 months compared to an average of 2.4 percent for the three comparable companies. For the 4-3/4 fiscal years, Rock Island's average net profit margin was only 2.6 percent compared to 4.0 percent for the comparable companies. Mr. Kiser determined that a discount of 20 percent was warranted in establishing a hypothetical "public" valuation for minority shares of Rock Island common stock. Mr. Kiser testified that he applied this 20 percent discount to take into account the fact that the particular shares in question were actually a minority interest and that Rock Island stock was worth less than that of the comparable companies based on performance. Thus, Mr. Kiser applied this 20 percent discount to compute the value of a 100 percent interest in the corporation as if it were "an aggregate of minority shares [800,000 minority shares]." [6] This reduced the value to $ 40.79 per share or a total of $ 32,632,000 for the company ($ 40.79 x 800,000 shares = $ 32,632,000). *249 Respondent's expert, Mr. Kramer, relied upon three valuation methods: (1) the price-to-earnings ratio, which he called the market approach, (2) the book value and adjusted book value method, which he called the cost approach, and (3) the projected earnings discounted to the present and alternative investment theory, which he called the earnings approach. Mr. Kramer compared Rock Island to the comparable companies only when he applied the price-to-earnings ratio approach that petitioner's experts had used. Rather than applying the 8.4 average price- to-earnings ratio of the comparable companies for the 12 months preceding the decedent's death to Rock Island, Mr. Kramer determined that a lower price-to-earnings ratio than that of the comparable companies should be applied to Rock Island. He used a price-to-earnings ratio of approximately seven to eight times 1981's earnings as well as seven to eight times a three-year weighted average of earnings. Mr. Kramer determined a range in value of a 100 percent ownership interest in Rock Island from $ 26,573,260 to $ 47,325,949. There is no explanation in the record as to exactly how he arrived at these figures. Mr. Kramer then considered *250 the earnings approach, in which he determined the present value of a stream of projected earnings of Rock Island, considering historical trends and the potential of Rock Island and its industry as a whole. Under this earnings approach, Mr. Kramer determined a range of value from $ 44,057,681 to $ 58,964,415. However, Mr. Kramer stated that while he took it into consideration, he gave this method very little weight when he made his final determination of the value of the stock. Mr. Kramer also admitted that he placed little weight on book value in his final determination. However, he determined that book value did have some relevance in the valuation of the company since Rock Island's employee bonus plan stated that no bonus would be paid to management until the shareholders had received as dividends 10 percent of the book value of the company at the beginning of the year. In addition, Mr. Kramer concluded that a willing seller would not sell his shares for less than the amount he would receive if he sold the assets of the business. Mr. Kramer determined that Rock Island had a book value of $ 80,000,000 and adjusted book value of $ 90,000,000. Mr. Kramer then used the $ 80,000,000 *251 figure in his determination of the value of Rock Island's stock, although he did not specify how he used the figure other than to state that it influenced his final determination of the value of the stock. Mr. Kramer stated that he took all of the above methods into consideration in reaching his final determination. He did not use any particular weighing formula for each method but tried to determine what a willing seller would accept for the shares. Mr. Kramer's final opinion of the fair market value of a 100 percent ownership interest in Rock Island as of September 28, 1981 was $ 45,000,000 ($ 56.25 x 800,000 shares) or $ 56.25 per share. After making their determinations with regard to a 100 percent interest in Rock Island if the company were a publicly traded company, petitioner's appraisers and respondent's appraiser then disagreed as to whether or not to distinguish between the value of the Class A voting, common stock and Class B non-voting, common stock that decedent owned. Petitioner's expert, Mr. Goelzer, decided not to differentiate between the value of the voting and non-voting stock since neither block of stock had an effective voice in determining company policies *252 or making decisions. Mr. Goelzer considered it unlikely that the Simmons family who owned 50 percent of the company would attempt to buy the 10 percent interest to gain control since no transactions had taken place between the families in 40 years and there were no indications that a transaction between the families was likely to occur in the immediate future. Mr. Goelzer also argued that the willing seller would only sell to his or her own family, who hold the 40 percent interest, and would not sell to the family with the 50 percent interest since the willing seller would not want to harm his or her own family's 40 percent interest in the company. Respondent's expert, Mr. Kramer, on the other hand, determined that the voting stock was worth 10 percent more than the non-voting stock. He valued the voting stock differently from the non-voting stock because of the ability of the owner of the voting stock to vote for a board of directors, who in turn run the company. Mr. Kramer valued the Class A voting stock at $ 61.26 per share and the Class B non-voting stock at $ 55.69 per share. Both petitioner's experts and respondent's expert applied a discount to the stock value for the *253 lack of marketability and the minority interest of the Rock Island stock held by the decedent. Mr. Goelzer considered the prevailing conditions of the oil industry, including the declining demand for gasoline and the continuing high crude oil costs, when determining the amount of the discount to apply. Mr. Goelzer also considered that no known market existed for the stock, no record of any previous transactions involving the stock existed, and no known contemplation of a public offering existed. See n.7, infra. Mr. Goelzer determined that a 45 percent discount should be applied to the previously determined public price of $ 40.79 per share. Thus, the petitioner's appraisers determined that all of the Rock Island stock should be valued at $ 22.43 per share ($ 40.79 - $ 18.36 = $ 22.43), for a total of $ 179,440 for the decedent's Class A stock and $ 170,468 for her Class B stock. Mr. Kramer, on the other hand, took only a 25 percent discount for the minority interest and lack of marketability of the stock. He thus determined the Class A voting stock to have a value of $ 45.94 per share and the Class B non-voting stock to have a value of $ 41.77 per share (i.e., 75 percent of *254 the $ 61.26 and $ 55.69 figures determined earlier). Mr. Kramer limited the discount to this percentage because he thought the decedent's 10 percent of the Class A voting stock had some "swing vote characteristics" and could create majority control in the hands of the other family with the 50 percent interest in the company. [7] Mr. Kramer also thought that the sale of the decedent's shares might cause the two families owning stock in the corporation to compete for the stock and thus increase the sales price of the stock. Mr. Kramer, however, indicated at trial that he was under the impression that the 50 percent Simmons' interest was owned by one individual rather than by a family. Upon petitioner's counsel suggesting that the Simmons' interest was actually owned by a family rather than by one individual, Mr. Kramer agreed that this might change his discount percentage at least a small amount. As noted earlier, the record is silent as to exactly which individual or individuals held the common stock, particularly the voting stock. Mr. Kramer thought that for the swing characteristics to apply to the decedent's 10 percent interest, the Simmons family would probably have to act in *255 concert to acquire the decedent's stock. Without the dual family interest in Rock Island, Mr. Kramer agreed that a 40 to 45 percent discount would probably be a reasonable discount for lack of marketability and minority interest. OPINION Property includable in a decedent's gross estate is generally included at its fair market value on the date of the decedent's death. Sec. 2031(a); [8]sec. 20.2031-1(b), Estate Tax Regs. *256 Fair market value is "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." Sec. 20.2031- 1(b), Estate Tax Regs.; Estate of Heckscher v. Commissioner,63 T.C. 485, 490 (1975). The willing seller and willing buyer must be hypothetical sellers and buyers rather than the particular individuals in the case. Estate of Bright v. United States,658 F.2d 999, 1005-1006 (5th Cir. 1981). In addition, the determination of the value must be made as of the valuation date, and any knowledge of future events that might affect the value of the stock cannot be attributed to the hypothetical willing sellers or buyers. Sec. 20.2031-1(b), Estate Tax Regs. When stocks *257 or securities of a corporation are traded on a stock exchange, the value of the stocks or securities is easily determined by reference to the relevant market price. However, valuation of closely held stock that is not listed on an exchange is imprecise; each case turns on its own particular facts. Hamm v. Commissioner,325 F.2d 934, 938 (8th Cir. 1963), affg. a Memorandum Opinion of this Court, cert. denied 377 U.S. 993 (1964); Estate of Messing v. Commissioner,48 T.C. 502, 512 (1967). The proper method of valuation is made "by taking into consideration, in addition to all other factors, the value of stock or securities of corporations engaged in the same or a similar line of business which are listed on an exchange." Sec. 2031(b); Estate of Hall v. Commissioner,92 T.C. 312 (1989). These corporations are often used to determine a ratio between the price of their stock and the earnings per share, dividends, and book values of the companies. Righter v. United States,439 F.2d 1204, 1207 (Ct. Cl. 1971). This ratio is then applied to the earnings per share, dividends, and book value of the corporation *258 in question. Righter v. United States, supra.
Other factors to be considered are the company's net worth, prospective earning power, dividend-paying capacity, the goodwill of the business, the economic outlook in the particular industry, and the degree of control in the business represented by the stock to be valued. Sec. 25.2512-2(f), Gift Tax Regs.; Estate of Hall v. Commissioner, supra;Ward v. Commissioner,87 T.C. 78 (1986); Estate of Andrews v. Commissioner,79 T.C. 938, 940 (1982). This Court has also considered the economic outlook in general, the condition and outlook of the specific industry in general, and the financial condition of the business. Northern Trust Co. v. Commissioner,87 T.C. 349, 378-379 (1986), affd. sub nom. Citizens Bank & Trust Co. v. Commissioner,839 F.2d 1249 (7th Cir. 1988). The weight to be accorded to each of these factors depends upon the facts in each case. Sec. 25.2512-2(f), Gift Tax Regs.; Estate of Andrews v. Commissioner, supra,79 T.C. at 941. *259 Petitioner bears the burden of proof in showing that the value determined by respondent is incorrect. Welch v. Helvering,290 U.S. 111 (1933). Expert witnesses' opinions are supposed to aid the court in understanding an area requiring specialized training, knowledge or judgment. [9] As the trier of fact, the court is not bound by the experts' opinions. Silverman v. Commissioner,538 F.2d 927, 933 (2d Cir. 1976), affg. a Memorandum Opinion of this Court, cert. denied 431 U.S. 938 (1977); Chiu v. Commissioner,84 T.C. 722, 734 (1985). One expert may be persuasive on one particular element of valuation while another expert may provide more incisive help on some other element of valuation. Parker v. Commissioner,86 T.C. 547, 562 (1986). Consequently, the trial court may adopt some portion and reject other portions of expert testimony. Helvering v. National Grocery Co.,304 U.S. 282 (1938). As detailed in *260 the Findings of Fact, both petitioner's experts and respondent's expert prepared a market method valuation, using the same three publicly held corporations as comparables. The three major differences in the appraisal reports of petitioner's experts and respondent's expert are: 1) that only respondent's expert also used the book value and an adjusted book value (cost) method and at least considered the earnings method (projected earnings discounted to the present) in his initial valuation of the company, 2) that only respondent's expert determined that the voting stock was worth more than the non-voting stock, and 3) the discount each party's expert applied for the lack of marketability and the minority interest. In this case both respondent's expert and petitioner's experts agreed that the price-to-earnings ratio of the comparable companies was approximately eight. However, there was a significant difference between the parties' determinations using this approach. Respondent's expert failed to explain the $ 20,000,000 plus difference (a 78 percent difference) between his highest figure of $ 47,325,949 and his lowest figure of $ 26,573,260 for a 100 percent ownership interest in Rock *261 Island. In fact, petitioner's valuation of $ 40,792,000 based on the price-to-earnings ratio of the comparable companies (before the 20 percent discount) was closer to respondent's expert's highest figure. Moreover, the difference between respondent's highest figure of $ 47,325,949 and petitioner's figure after the 20 percent discount (i.e., $ 32,632,000) is only a 45 percent difference, compared to Mr. Kramer's 78 percent variance. Respondent's expert offered no explanation as to how he came up with these widely divergent figures other than to state that he applied a price-to-earnings ratio of approximately seven to eight times Rock Island's 1981 earnings and seven to eight times a three-year weighted average of earnings. We agree with respondent's expert that there is no particular formula to be applied in valuation cases. We also think that any such formulas might well create the comforting, but wholly illusory, impression of precision and certainty in an area that is inherently imprecise and uncertain. Nonetheless, even in a valuation case, a court must reach a reasoned result and *262 must eschew the "random walk approach, which leaves no trail" for the litigants, the bar, or an appellate court to follow. Akers v. Commissioner,798 F.2d 894, 897 (6th Cir. 1986), revg. and remanding a Memorandum Opinion of this Court; Symington v. Commissioner,87 T.C. 892, 904 (1986). Thus, it would be helpful to the Court if experts too would eschew the "random walk approach." [10]
Due to the lack of explanation as to the variance in respondent's figures as opposed to the logic behind petitioner's use of *263 the price-to-earnings ratio, we conclude that petitioner's determination of $ 40,792,000 is closer to the value of a 100 percent ownership interest in Rock Island than respondent's determination under the price-to-earnings method of valuation. Petitioner, however, went further and reduced its original determination of $ 40,792,000 by 20 percent. This reduction was made to account for the fact that Rock Island's net and average profit margins were lower than those of comparable companies (performance factor) and the fact that the decedent held a minority interest in Rock Island. Respondent's expert, Mr. Kramer, also thought that Rock Island should not be compared solely to the comparable companies without any adjustments. Rather than discounting the total value figure, Mr. Kramer determined that a lower price-to-earnings ratio than that determined for the comparable companies should be applied to Rock Island. Thus, the experts on both sides essentially agreed that the ratio between the price of the stock and the earnings per share of Rock Island should not be quite as high as that of the comparable companies. In discounting the total valuation figure by 20 percent, petitioner's *264 expert, Mr. Kiser, also took into account the fact that the decedent owned a minority interest in Rock Island. He explained that the price of the publicly traded stock already reflected minority shares because buyers and sellers on an exchange are dealing in minority shares and not the value of the company as a whole. Moreover, his value of $ 40.79 per share or his total of $ 32,632,000 ($ 40.79 x 800,000 shares = $ 32,632,000) represents the value of the entire corporation "as an aggregate of minority shares." Nonetheless, later on in the appraisal petitioner's other expert, Mr. Goelzer, again discounted his valuation based on the fact that the decedent owned only a minority interest. Thus, petitioner's experts to some extent applied a minority discount twice in their determination of the value of the Rock Island stock. [11] Thus, we conclude that although a discount should be applied here, it should not be as great as 20 percent since any discount should relate only to performance differences between the comparable companies and Rock Island. A discount for the minority shares will be discussed later. Here, we will apply a 10 percent discount to $ 40,792,000 to account for the *265 fact that the price-to-earnings ratio of Rock Island should not be quite as high as that of the comparable companies, making a 100 percent ownership interest in Rock Island, under the price-to-earnings (market) method of valuation, of $ 36,712,800. [12]
The point where the experts next diverge is with regard to the two other methods respondent's expert considered in addition to the price-to-earnings approach. Mr. Kramer also considered the book value and adjusted book value approach, the cost method, and also the earnings method. Using the earnings method, Mr. Kramer stated that he attempted to determine the present value of a stream of projected earnings of Rock Island stock, using historical trends and the potential of Rock Island. Although Mr. Kramer admitted that he gave little weight to the *266 earnings method, he offered no explanation as to how the method influenced his determination of value and offered little explanation as to why the Court should consider it. See n.10, supra. Therefore, we will not consider this method in our determination. With regard to the cost approach or the book value and adjusted book value method, Mr. Kramer did not compare the book values of the comparable companies to the book value of Rock Island. Mr. Kramer, however, thought the book value and adjusted book value of Rock Island had some relevance to the company since the company based employee bonuses on whether the shareholders had received 10 percent of the company's book value as dividends. Petitioner's experts disavowed the use of this approach, stating that the book value of a company was primarily valuable in liquidation or merger cases or the valuation of companies with investment holdings or real estate. Of the three factors usually considered, earnings, dividends, and book value, book value is regarded as the least important in the case of a manufacturing company with consistent *267 earnings and dividend records. Righter v. United States, supra,439 F.2d at 1210; Central Trust Co. v. United States,305 F.2d 393, 411 (Ct. Cl. 1962). This Court has also placed greater weight on the earning power of the company as opposed to the adjusted book value when the company is actively engaged in producing income rather than holding the property for investment. Ward v. Commissioner, supra,87 T.C. at 102; Estate of Andrews v. Commissioner, supra,79 T.C. at 945. In addition, this Court has determined that the adjusted book value is not a good measure for valuing minority shares of a going concern since the minority shareholder does not have the power to liquidate the company. [13]
Respondent's expert, Mr. Kramer, acknowledged that book value is not always considered the best approach to value a corporation's stock. However, Mr. Kramer contended that the book value of a company is insignificant only if a company has consistent earnings and dividend *268 records and that this was not true of Rock Island since Rock Island had an operating loss in 1981. Rock Island, however, was primarily involved in refining oil to produce other products, rather than holding property for investment purposes. In addition, the decedent's interest was a minority interest. These facts, in addition to the fact that Mr. Kramer did not specify how he used the cost method in reaching his final value of $ 45,000,000, lead this Court to accord little weight to the book value and adjusted book value when valuing Rock Island. We so conclude despite the fact that Rock Island was in the process of making improvements worth over $ 40,000,000 and Rock Island owned 213 gasoline stations at the time of the decedent's death. These improvements were probably necessary to assure Rock Island's survival considering the admittedly dismal economic and industry conditions it was facing at that time. Another point at which respondent's appraisal report diverged from that of petitioner's experts was Mr. Kramer's determination that the voting stock was worth more than the non- voting stock in Rock Island. There were only 80,000 shares of voting stock compared to 720,000 *269 shares of non-voting stock. In this case the difference between the voting and non-voting stock in Rock Island is the ability to vote for a board of directors and any "swing vote characteristics" of a 10 percent block of voting stock. In being able to vote for a board of directors, a shareholder has a voice, albeit perhaps a small voice in certain instances, in deciding corporate policy, directing the payment of dividends, and compelling a liquidation. Thus, the owner of a 10 percent voting interest in a corporation retains the possibility of control, even if it must be exercised in conjunction with other shareholders, over the closely held corporation. On the other hand, the owner of a non-voting share of stock has no likelihood of influencing corporate policy, other than by selling his shares of stock in disapproval over what the board of directors has done. We think petitioner's experts could not reasonably treat the voting and non-voting stock as having the same value. Thus, we find that the value of the Class A voting, common stock was higher than the Class B non-voting, common stock. This 10 percent block of voting stock could become pivotal in this closely held corporation, *270 where members of one family held 50 percent and members of another family held 40 percent. By joining with the Simmons family, a minority shareholder could effect control over the corporation and by joining the Winkler family, such a minority shareholder could block action. Petitioner seems to place too much emphasis on the fact that the two families had had 50-50 control for some 40 years and that neither family had ever tried to wrest control from the other. Under the willing seller-willing buyer definition of fair market value, one cannot consider the willing seller or willing buyer as a member of either family. Petitioner improperly suggests that no member of the Winkler family would sell the shares to a member of the Simmons family. Petitioner also fails to consider a sale to an unrelated outsider. Looking at this even split between the two families, the 10 percent block of voting stock, in the hands of a third party unrelated to either family, could indeed become critical. While it is difficult to put a value on this factor, we think it increases the value of the Class A voting stock by at least the 10 percent that Mr. Kramer found. The Court thinks this factor might *271 well increase the value of the voting stock even more, but respondent has suggested no basis for a higher percentage increase. However, this factor becomes important in the matter of any minority discount below. The experts for both parties discounted their valuation of a 100 percent ownership interest in the corporation for the fact that the decedent held a minority interest in the company and for the lack of marketability of the shares. Courts have long recognized that the shares of stock of a corporation that represent a minority interest are usually worth less than a proportionate share of the value of the assets of the corporation or a 100 percent ownership interest in a company. Ward v. Commissioner, supra,87 T.C. at 106; Estate of Andrews v. Commissioner, supra,79 T.C. at 953. The minority discount is recognized because the holder of a minority interest lacks control over corporate policy, cannot direct the payment of dividends, and cannot compel a liquidation of corporate assets. Ward v. Commissioner, supra;Harwood v. Commissioner,82 T.C. 239, 267 (1984), *272 affd. without published opinion 786 F.2d 1174 (9th Cir. 1986). A discount for lack of marketability, on the other hand, reflects the fact that there is no ready market for shares in a closely held corporation. Ward v. Commissioner, supra,87 T.C. at 106-107; Estate of Andrew v. Commissioner, supra,79 T.C. at 953. When determining this discount, this Court has also considered the corporation's history of paying dividends and the amount of these dividends, as well as the future of the company and its dividend-paying capacity. Northern Trust Co. v. Commissioner, supra,87 T.C. at 388-389. In this case the decedent held 10 percent of the Class A voting stock and approximately one percent of Class B non-voting stock. Petitioner's expert, Mr. Goelzer, applied a 45 percent discount to account for the decedent's minority interest and the lack of marketability of the shares. Mr. Kramer refused to apply such a large discount, applying only a 25 percent discount for the minority interest and lack of marketability. Mr. Kramer applied only a 25 percent discount, because he thought that the stock had swing characteristics. *273 Mr. Kramer stated that the two families, the Winklers and the Simmons, might compete for the decedent's shares to either seek control in the case of the Simmons or prevent the Simmons from obtaining control in the case of the Winklers. When Mr. Kramer did the appraisal, he was under the impression that the Simmons' interest was owned or controlled by one individual. Thus, Mr. Kramer thought that this one individual would attempt to outbid any other willing buyers to acquire the shares and thus control the company. While petitioner's counsel suggested that Mr. Kramer was in error and that the stock was owned by the Simmons family, not by one member of the Simmons family, petitioner has failed to prove that such is the fact, particularly as to the Class A voting stock. The record is singularly lacking in information as to exactly who holds the Rock Island stock and in what size blocks. Petitioner's expert report states that: The common stock is very closely held by members of seven families. It is our understanding that the Class A (Voting) stock is owned 50% by various members of the Winkler family and the other 50% by members of the Simmons family. The shareholders of Class *274 A common consist of 3 individuals, a trust and a corporation. * * * The Court has assumed that the trust mentioned therein is the Clara S. Roeder Winkler Living Trust that held the 8,000 shares of voting stock involved in this case. There is simply no evidence as to the identity of the three individuals or the corporation (and its shareholders) who own the remaining Class A voting, common stock of Rock Island, or as to how many shares each held. Thus, the Class A voting, common stock held by the Simmons family may or may not be held by a single individual. If the fact is important, petitioner has failed to carry its burden of proof. In determining how much of a minority discount to apply, we may not assume that the purchaser of stock is a member of the decedent's family. Propstra v. United States,680 F.2d 1248, 1251-1252 (9th Cir. 1982); Estate of Hall v. Commissioner, supra;Minahan v. Commissioner,88 T.C. 492, 499 (1987). This Court has held that a minority interest in a corporation should not be assumed to have any controlling *275 value, even though the shareholder's family controls the corporation. Estate of Bright v. United States, supra,658 F.2d at 1002-1003; Estate of Andrews v. Commissioner, supra,79 T.C. at 953. The transfer must be analyzed from the point of view of a hypothetical seller and a hypothetical buyer rather than a particular person or family member. Estate of Bright v. Commissioner, supra, 658 F.2d at 1005-1006, Estate of Andrews v. Commissioner, supra,79 T.C. at 956. This is regardless of the fact that the reality of the situation may be that the stock will probably be sold to a certain party or person. Estate of Andrews v. Commissioner, supra.However, the hypothetical sale should not be construed in a vacuum isolated from the actual facts that affect the value of the stock in the decedent's hands. Estate of Andrews v. Commissioner, supra.If there is an established or ready market for the shares, the hypothetical willing buyer need not be part of the general public. Luce v. United States,4 Cl. Ct. 212 (1983). No minority discount is then applied to those *276 shares of stock if there is a market, for example, among the existing shareholders of a closely held corporation. Luce v. United States, supra.
Respondent includes a discount of only 25 percent for the minority interest and lack of marketability of petitioner's shares, arguing that the decedent's shares provide leverage for the families to either maintain the status quo or gain control of Rock Island. Mr. Kramer also included only a 25 percent discount based on his impression that the Simmons' stock was owned by one individual rather than by a family. When valuing shares of a closely held corporation one cannot assume that a particular family member or other individual will purchase the stock. The Court concludes that here both parties have placed entirely too much emphasis on the potential seller or buyer as either a member of the Winkler family or a member of the Simmons family. The willing buyer could be an unrelated third party who rather than demanding a minority discount would be willing to pay a premium for a 10 percent block of voting stock that could be pivotal *277 as between the two families. Mr. Kramer only labeled the stock as "swing" stock when he assumed that the Simmons' 50 percent interest was owned and controlled by one individual. Whether or not that is the fact, we conclude that a 10 percent block of voting stock has "swing vote characteristics" and that a minority discount would be inappropriate here. As to the non-voting stock, we conclude otherwise, because there would be no swing factor there in any event. Thus, we will not consider any swing characteristics when determining the discounts to apply to the Class B non-voting, common stock. With regard to the discounts for the minority interest, the courts vary as to the actual discount to apply. Mr. Kramer testified that without the swing characteristic of the stock, a 40 to 45 percent minority and lack of marketability discount would not be unusual for this stock. We find that the value of the Class B non-voting, common stock should be discounted by 20 percent for the minority interest in the Rock Island Company. This is a moderate discount and within a range that this Court has applied many times before in cases such as this. See Northern Trust Co. v. Commissioner, supra,87 T.C. at 385. *278 With regard to the discount for the lack of marketability of the Rock Island stock, we will apply a discount of 25 percent to both voting and non-voting stock. In applying this discount we are considering the fact that the stock of an unlisted, closely held corporation is generally difficult to sell. Again that may not be the case for the voting stock. However, since we have already disallowed the minority discount for the voting stock, we find no basis for disregarding the fact that all of the stock would probably be difficult to sell. We also are taking into account the fact that, due to the dismal outlook for the refining industry in 1981, the future of the company did not appear to be optimistic at that time. While the factors we have considered are not readily quantifiable and any quantification of the same may give an unwarranted appearance of precision and exactitude, we nonetheless will retrace the path where our holdings lead us. We hold that the value of the Rock Island corporation as a whole was $ 36,712,800 which is to be apportioned among the total 800,000 shares for a value of $ 45.89 per share. The value of the block of Class A voting stock in this case is then *279 to be increased by 10 percent for the fact that it is voting stock and decreased by 25 percent for lack of marketability. Thus the value of this Class A voting stock is $ 37.86 per share or $ 302,880 for the 8,000 shares. The block of Class B non-voting stock in this case is to be reduced by 20 percent for the minority discount and 25 percent for lack of marketability, for a total decrease of 45 percent. Thus the value of this Class B non-voting stock is $ 25.24 per share or $ 191,824 for the 7,600 shares. To reflect the concessions and the above holdings, Decision will be entered under Rule 155.
Footnotes
1. In the notice of deficiency respondent determined that the amount of the deficiency was increased due to proceeds of uncashed checks made out to the decedent that were includible in the gross estate and a Federal income tax refund payable to the decedent's estate that was includible in the gross estate, and the deficiency was decreased due to deductions from the gross estate for a court-ordered payment in settlement of a suit and for Federal income taxes for the 1981 taxable year. In the stipulation of facts petitioner agreed that respondent's determinations with regard to these items were correct. Petitioner did, however, contest respondent's determination that a deduction be allowed for attorney's fees in the amount of $ 50,000, arguing that the correct amount cannot yet be determined but was likely to exceed this amount. The parties agreed that petitioner properly preserved its right to claim additional legal fees and administrative expenses, including appraisal fees, witness fees, and interest, if any, that may have been incurred with respect to this proceeding.↩
2. The decedent's son, Elmer L. Winkler, was serving as trustee of the Clara S. Roeder Winkler Living Trust on behalf of the decedent at the time of decedent's death, September 28, 1981. However, when Elmer L. Winkler died on November 23, 1982, Doris Ann Winkler, the decedent's daughter, became trustee of the Clara S. Roeder Winkler Living Trust.↩
3. The parties have so stipulated. However, we assume this simply means that the Winkler family as a whole cannot control Rock Island because the Simmons family as a whole owned the other 50 percent of the voting stock. As noted above, the record does not identify the three individuals and the corporation (or its shareholders) who own the rest of the voting stock. Also "family attribution" rules do not apply to stock valuation. Ward v. Commissioner,87 T.C. 78, 106-108↩ (1986).
4. When respondent requested an appraisal report from Mr. Kramer, respondent's representatives showed him the report of Goelzer & Co. and indicated that they thought the final valuation numbers that Goelzer & Co. determined were too low. However, respondent's representatives did not indicate to Mr. Kramer what respondent thought the value of the stock should be.↩
5. Petitioner's experts selected the companies Asamera, Inc., Holly Corp., and Marion Corp. since they were roughly the same size as Rock Island and had a fairly comparable product mix and similar pattern of earnings as Rock Island during the five years 1977-1981. Respondent's expert also used these same three companies.↩
6. Mr. Kiser, in response to the Court's questions, explained that when stocks are traded in the public market, usually only minority shares are traded and the buyers and sellers are dealing only in minority shares, not purchasing the entire company. Thus, Mr. Kiser seemed to suggest that a minority discount was already built into the figures.↩
7. Mr. Kramer also mentioned vague rumors of a tender offer and possible sale of the company. Mr. Kramer stated that mention of this was made in the board of directors' meeting 12 days before the death of the decedent; however, these minutes were never submitted as evidence. At the time of the trial no tender offer had taken place. The Court is unwilling to find as a fact that a tender offer and possible sale were or were not discussed; on the other hand the Court is also not willing to find as a fact, as Mr. Goelzer assumed, that there was no known contemplation of a public offering. Accordingly, the Court gives no weight to this factor one way or the other.↩
8. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect on September 28, 1981, the date of the decedent's death, and all "Rule" references are to the Tax Court Rules of Practice and Procedure.↩
9. Estate of Rodriguez v. Commissioner,T.C. Memo. 1989-13↩.
10. Respondent's expert appears to be extremely well qualified but he favored us with too little of his thought processes in his report. In another area, for example, his report briefly referred to the projected earnings approach, but the discussion was too abbreviated to be helpful. His testimony on the computer models he used, while unfortunately never developed by counsel, suggested that a lot of work had been done but simply not spelled out in his report. That may also be the case in his price-to- earnings computations, but the Court cannot simply accept his conclusions without some guide as to how he reached those conclusions.↩
11. Mr. Kiser and Mr. Goelzer each worked on separate sections of the appraisal report. ↩
12. Although courts often look at a closely held corporation's dividends as compared to the dividends of comparable companies, when valuing the closely held corporation, neither petitioner's experts nor respondent's expert compared dividends. For this reason, we will not consider this approach.↩
13. Martin v. Commissioner,T.C. Memo. 1985-424; Estate of Heppenstall v. Commissioner,8 T.C.M. 136↩, 142 (1949).